AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)      ☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California



LODGED
CLERK, U.S. DISTRICT COURT
2/18/2022
CENTRAL DISTRICT OF CALIFORNIA
BY: ___ DEPUTY

FILED
CLERK, U.S. DISTRICT COURT
2/18/2022
CENTRAL DISTRICT OF CALIFORNIA
BY: __bm__ DEPUTY

United States of America

v.

MARCO ANTONIO ZAZUETA and
GUSTAVO ADOLFO FELIX-MARTINEZ,

Defendant(s)

Case No.   2:22-mj-00693-DUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of February 17, 2022, in the county of Los Angeles in the Central District of California,

the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1) | Possession with Intent to Distribute a Controlled Substance |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

/s/ Kyle Hegarty
*Complainant's signature*

Kyle Hegarty, DEA Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:   February 18, 2022

*Judge's signature*

City and state:   Los Angeles, California      Hon. Jean P. Rosenbluth, U.S. Magistrate Judge
*Printed name and title*

AUSA: Maria Elena Stiteler (x6148)

## AFFIDAVIT

I, Kyle Hegarty, being duly sworn, declare and state as follows:

### I. PURPOSE OF AFFIDAVIT

1. This affidavit is made in support of a criminal complaint and arrest warrants against Marco Antonio ZAZUETA ("ZAZUETA") and Gustavo Adolfo FELIX-MARTINEZ ("FELIX-MARTINEZ") for violation of 21 U.S.C. § 841(a)(1): Possession with Intent to Distribute a Controlled Substance.

2. This affidavit is also made in support of an application for a warrant to search the following digital devices (collectively, the "SUBJECT DEVICES"), in the custody of the Drug Enforcement Administration, in Los Angeles, California, as described more fully in Attachment A:

   a. One blue and purple HUAWEI cell phone model MAR-LX3A contained inside a black plastic case ("SUBJECT DEVICE 1"); and

   b. One Silver Apple iPhone contained inside a clear plastic case with a pop socket ("SUBJECT DEVICE 2").

3. The requested search warrants seek authorization to seize evidence, fruits, or instrumentalities of violations of 21 U.S.C. § 841(a)(1) (possession with intent to distribute controlled substances) and 21 U.S.C. § 846 (conspiracy and attempt to distribute controlled substances) (the "Subject Offenses"), as described more fully in Attachment B. Attachments A and B are incorporated herein by reference.

4. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and

information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint, arrest warrant, and search warrant, and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND OF AFFIANT

5. I am a Special Agent ("SA") with the United States Drug Enforcement Administration ("DEA") and have been so employed since March of 2019. The DEA is responsible for investigating Title 21 crimes, including the activities of both national and international drug trafficking organizations. I am currently assigned to the DEA's Los Angeles Field Division, High Intensity Drug Trafficking Area Group 51 ("HIDTA 51"). HIDTA 51 investigates large-scale drug organizations operating in the Southern California area and elsewhere. I received 16 weeks of narcotics law enforcement training at the DEA Basic Agent Training at the DEA Academy, Quantico, Virginia. Through the DEA Academy and continuing education, I have received extensive training on conducting federal narcotics investigations, investigative techniques, conducting undercover operations, interviewing witnesses and subjects, developing sources, and search and seizure of evidence, among other things.

6. Between June of 2013 and March of 2019, I was employed as a police officer with the East Hartford Police Department in

Connecticut. I conducted local narcotics investigations as an investigator with the Vice, Intelligence, and Narcotics unit, resulting in the arrest and prosecution of numerous drug traffickers and violent offenders.

7. Based on this training, experience, and conversations with other narcotics investigators, I am familiar with drug traffickers' methods of operation including the distribution, storage, and transportation of drugs, as well as the collection of drug proceeds and methods of money laundering used to conceal the nature of the proceeds. I have received training and collaborated with other law enforcement officers regarding the unlawful importation, possession, and distribution of controlled substances. Based on this experience and work with other law enforcement agents, I am familiar with public corruption statutes and money-laundering statutes involving the proceeds of specified unlawful activities and conspiracies associated with criminal narcotics, in violation of Titles 18 and 21 of the United States Code. I also speak regularly with narcotics investigators at the federal, state, and local level, as well as drug traffickers and informants, regarding the manner in which drug traffickers store, sell, and transport narcotics.

### III. SUMMARY OF PROBABLE CAUSE

8. Beginning in December 2021, HIDTA 51 learned of a Los-Angeles-based methamphetamine broker with the moniker "TOCAYO." On January 13, 2022, TOCAYO, later identified as Jorge Adrian RODRIGUEZ-SANCHEZ ("RODRIGUEZ-SANCHEZ"), sold approximately 3 pounds of suspected methamphetamine to a DEA undercover agent

("UC") in Carson, California. DEA Southwest Laboratory testing confirmed that the UC purchased approximately 1,337 grams of methamphetamine with a 97% purity from RODRIGUEZ-SANCHEZ. On February 7, 2022, RODRIGUEZ-SANCHEZ agreed to sell the UC an additional fifty pounds of methamphetamine on February 16 or 17, 2022. On February 15, 2022, the Honorable Alka Sagar issued a complaint and arrest warrant for RODRIGUEZ-SANCHEZ in case number 2-21-mj-00611-DUTY (the "February 15 Complaint").

9. On February 17, 2022, shortly before the second planned deal between RODRIGUEZ-SANCHEZ and the UC, law enforcement saw FELIX-MARTINEZ arrive at the location of the planned deal in Carson, California, in a black Nissan Juke driven by ZAZUETA. There, law enforcement saw FELIX-MARTINEZ deliver a blue duffel bag to the trunk of a black Nissan Sentra controlled by RODRIGUEZ-SANCHEZ. During a search of the Nissan Sentra, law enforcement found a black and blue duffel bag in the trunk with 28 individually packaged bags, each containing a crystal-like substance resembling methamphetamine.

10. Law enforcement stopped the Nissan Juke, searched the car, and found eleven zip lock bags, each containing a crystal-like substance resembling methamphetamine. Upon further inspection, law enforcement found a hidden compartment in the Nissan Juke with an additional twenty-four zip lock bags, each containing a crystal-like substance resembling methamphetamine.

11. After being Mirandized, both FELIX-MARTINEZ and ZAZUETA admitted to delivering the black and blue duffel bag that day.

12. Law enforcement found SUBJECT DEVICE 1 and SUBJECT DEVICE 2 in the Nissan Juke.

## IV. STATEMENT OF PROBABLE CAUSE

13. Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

### A. Initiation of Investigation

14. On December 16, 2021, SA Josh Legere of the Imperial County District Office contacted me with information pertaining to a methamphetamine supplier in Los Angeles, California. SA Legere advised me that a Confidential Source (hereinafter referred to as CS[1]) was in contact with a drug broker from Tijuana, Mexico. I know, based on my training and experience, the term "broker" is a common reference to someone who puts a drug buyer in contact with a drug supplier.

15. The broker put the CS in contact with a Los-Angeles-based methamphetamine source of supply, with the moniker "TOCAYO," who was using a phone number ending in -4739 (and who was, as described below, later identified as RODRIGUEZ-SANCHEZ). From speaking to the CS, I understand that on December 13, 2021, the CS spoke with RODRIGUEZ-SANCHEZ in an unrecorded conversation on the WhatsApp application that included a

---

[1] The CS has cooperated with the DEA since 2021. Since that time, the CS has provided information for numerous investigations, both foreign and domestic, including investigations involving drug and firearm seizures. The information provided by the CS has been corroborated and has been proven to be reliable. The CS has a criminal history to include a conviction for a drug related offense in the United States. The CS is working with the DEA for financial compensation.

5

discussion of future purchases of large quantities of methamphetamine at a prospective price at $1,100 per pound of methamphetamine. RODRIGUEZ-SANCHEZ advised the CS to come to his "oficina" on Sandhill Avenue, Carson, California (the "Sandhill address") to conduct business.

16. At approximately 6:43 PM, on January 4, 2022, SA Daniel Mendoza, acting in an undercover capacity, called the -4739 number. Based on my conversation with SA Mendoza, I understand that in that conversation, which was recorded and took place in the Spanish language,[2] the caller and SA Mendoza agreed to a sample buy of around three (referring to three pounds of methamphetamine as a sample buy). After the conversation, SA Mendoza texted the -4739 number to confirm that the price would be $1,200 per pound of methamphetamine.

B. **January 13, 2022 Controlled Buy**

17. On Monday, January 10, 2022, SA Mendoza, acting in an undercover capacity, exchanged Spanish-language text messages with RODRIGUEZ-SANCHEZ using the -4739 number. As I understand from speaking to Spanish-speaking agents, in these messages, SA Mendoza was able to confirm that the previously discussed purchase of three pounds of methamphetamine would take place on Thursday, January 13, 2022.

18. On Thursday, January 13, 2022, SA Mendoza and RODRIGUEZ-SANCHEZ arranged to meet at 1:00 PM that day at the Sandhill address in Carson, California. Based on my review of

---

[2] All translations included in this affidavit are preliminary, such that final transcripts may reflect changes after additional review.

Google Earth imagery, I learned that the Sandhill address referred to an industrial business building.

19. From my personal knowledge, from speaking with HIDTA investigators who were present, including SA Mendoza, from reviewing the audio recordings and photographs of the deal, and from reviewing reports describing the deal, I understand the following:

    a. On the afternoon of January 13, 2022, SA Mendoza met with RODRIGUEZ-SANCHEZ at the Sandhill address, where he exchanged $3,600 in cash for three vacuum sealed packages, each containing hard rock-like substances. During the deal, SA Mendoza and RODRIGUEZ-SANCHEZ discussed the possibility of a future deal of 50 or more at $1,100 per pound. DEA Southwest Laboratory testing later confirmed that the substance SA Mendoza purchased from RODRIGUEZ-SANCHEZ was approximately 1,337 grams of methamphetamine with a 97% purity.

    C. **February 7, 2022 Communications with RODRIGUEZ-SANCHEZ**

20. On February 7, 2022, SA Mendoza texted the -4739 number to ask RODRIGUEZ-SANCHEZ to call him when he could. Shortly thereafter, SA Mendoza received a phone call from RODRIGUEZ-SANCHEZ. The following conversation took place in Spanish and was summarized to me by SA Mendoza:

    a. During the conversation, SA Mendoza and RODRIGUEZ-SANCHEZ greeted each other, and then agreed that RODRIGUEZ-SANCHEZ would sell SA Mendoza an additional fifty pounds of methamphetamine on February 16 or 17, 2022, at the same place as last time.

**D.   Complaint and Arrest Warrant for RODRIGUEZ-SANCHEZ**

21.  On February 15, 2022, the Honorable Alka Sagar issued a complaint and arrest warrant for RODRIGUEZ-SANCHEZ in case number 2-21-mj-00611-DUTY (the "February 15 Complaint").

**E.   February 17, 2022 Surveillance and Enforcement**

22.  At approximately 5:00 AM on February 17, 2022, members of HIDTA group 51 established surveillance on RODRIGUEZ-SANCHEZ at an address on Essey Avenue in Compton, California, where RODRIGUEZ-SANCHEZ had been previously observed.  I understand the following from my personal participation in the surveillance and from speaking to other members of the surveillance team:

   a.   At approximately 6:33 AM, RODRIGUEZ-SANCHEZ left the residence on Essey Avenue and got into a beige 2001 Toyota Camry, bearing California license plate 6KID153 ("Toyota Camry").  The surveillance units followed RODRIGUEZ-SANCHEZ to the Sandhill address in Carson, California.  During that time, surveillance units did not observe RODRIGUEZ-SANCHEZ put anything in the Toyota Camry that might hold fifty pounds of methamphetamine.

23.  At approximately 8:44 AM, SA Mendoza called RODRIGUEZ-SANCHEZ.  The following conversation took place in Spanish and was translated to me by TFO Sal Duarte:

   a.   SA Mendoza advised RODRIGUEZ-SANCHEZ he was ready.  RODRIGUEZ-SANCHEZ said he would tell the "chavalo" that it would be earlier.  Through a series of text messages, RODRIGUEZ-SANCHEZ advised SA Mendoza that the sale would take place at 12:00 PM that day.  As I understand based on my

8

training and experience and from speaking to Spanish-speaking agents, when RODRIGUEZ-SANCHEZ referred to a "chavalo," it indicated that a second person or people would delivering the methamphetamine.

24. At approximately 11:55 AM, SA Mendoza placed a phone call to RODRIGUEZ-SANCHEZ. Due to a malfunction in the recording software, this phone call was not recorded. SA Mendoza advised me that RODRIGUEZ-SANCHEZ told him RODRIGUEZ-SANCHEZ had half the order, and that the other half was being delivered but the man was stuck in traffic. RODRIGUEZ-SANCHEZ told SA Mendoza the man would arrive around 12:30 PM. During this conversation, TFO Olga Alvarado saw RODRIGUEZ-SANCHEZ exit the business at the Sandhill address and stand near the Toyota Camry. TFO Alvarado also saw RODRIGUEZ-SANCHEZ leaning into the open hood of a black vehicle parked next to his Toyota Camry. This vehicle was later identified as a black Nissan Sentra bearing California license plate 4VLB173 (the "Nissan Sentra").

25. At approximately 12:29 PM, an air support unit from Los Angeles Police Department ("LAPD") arrived and reported observing the following:

   a. A black vehicle entered the parking lot of the Sandhill address. This black vehicle was later identified as a Nissan Juke bearing California license plate 8YFC712 (the "Nissan Juke").

   b. RODRIGUEZ-SANCHEZ walked to the Nissan Juke, and the Nissan Juke pulled into a parking spot between RODRIGUEZ-SANCHEZ's Toyota Camry and the black Nissan Sentra. A man

9

(later identified as FELIX-MARTINEZ) exited the passenger side of the Nissan Juke, and the Nissan Juke then pulled out of the parking spot and backed in so the trunk was facing FELIX-MARTINEZ and RODRIGUEZ-SANCHEZ.

      c.    LAPD air support then reported seeing the trunk of the Nissan Juke open and FELIX-MARTINEZ remove a blue duffel bag from the trunk, drop the bag into the Nissan Sentra, close the trunk of the Nissan Juke, and re-enter the Nissan Juke.

26. TFO Alvarado, who was conducting ground surveillance, also reported seeing the black Nissan Juke arrive, FELIX-MARTINEZ step out, and the Nissan Juke reposition itself; however, TFO Alvarado was not in a position to see the trunk of the two vehicles.

27. After the bag was placed in the Nissan Sentra, the Nissan Juke drove away, with HIDTA 51 investigators following the Nissan Juke out of the area.

28. At approximately 12:35 PM, as the Nissan Juke was leaving the business, RODRIGUEZ-SANCHEZ called SA Mendoza and advised him to come. This indicated to me the bag that FELIX-MARTINEZ delivered to RODRIGUEZ-SANCHEZ contained methamphetamine for the deal.

29. At approximately 12:40 PM, LAPD uniformed K9 Officers Esther Kim and Dolores Suviate conducted a motor vehicle stop of the Nissan Juke on Avalon Boulevard in Carson. The officers identified FELIX-MARTINEZ as the passenger of the Nissan Juke and ZAZUETA as the driver. TFO Pena and Officer Kim remained at

the motor vehicle stop while the remaining HIDTA 51 investigators returned to the Sandhill address.

30. At approximately 12:45 PM, HIDTA 51 investigators and I arrested RODRIGUEZ-SANCHEZ in the parking lot of the Sandhill address, pursuant to the complaint and arrest warrant authorized on February 15, 2022. Officer Suviate conducted a sweep of the exterior of the Nissan Sentra with her K9, which was trained to detect the odor of illegal drugs. Officer Suviate advised me her K9 alerted to the presence of illegal drugs in the Nissan Sentra. During a search of RODRIGUEZ-SANCHEZ, I located a set of car keys in his pants pocket. The key set had a Nissan key which I found fit the Nissan Sentra.

31. Due to the planned deal between RODRIGUEZ-SANCHEZ and the UC, law enforcement officers' observations during surveillance, the positive alert by a drug sniffing K9, and RODRIGUEZ-SANCHEZ having direct access to the Nissan Sentra, I searched the Nissan Sentra. During the search, in the trunk of the Nissan Sentra I found a black plastic bag and cardboard box, both of which contained individually packaged bags holding a crystal-like substance resembling methamphetamine. In total, there were 22 individually packaged bags in the bag and the box. I also found a black and blue duffel bag containing an additional 28 individually packaged bags, each containing a crystal-like substance resembling methamphetamine. This duffel bag was consistent with the bag LAPD air support described as having been transferred from the trunk of the Nissan Juke.

### I.  Vehicle Stop of the Nissan Juke

32.  Meanwhile, at the traffic stop on Avalon Boulevard, Officer Kim conducted a sweep of the Nissan Juke with her drug sniffing K9, which was trained to detect the presence of illegal drugs.  Officer Kim reported that her K9 alerted to the presence of illegal drugs at the trunk of the vehicle.  Due to the positive K9 alert, TFO Do and Officer Kim searched the vehicle.  During the search of the vehicle, TFO Do located eleven zip lock bags wrapped in a blue blanket in the trunk of the vehicle, each containing a crystal-like substance resembling methamphetamine.

33.  TFO Do located SUBJECT DEVICE 1 in the passenger seat of the Nissan Juke and SUBJECT DEVICE 2 in the driver's seat of the Nissan Juke.

34.  I traveled to the Nissan Juke to speak with ZAZUETA and FELIX-MARTINEZ.  Both men are Spanish speakers and the following interviews were recorded and translated to me by TFO Duarte and GS Quezada:

   a.  During the interview with FELIX-MARTINEZ, TFO Duarte, GS Quezada, and I were present.  FELIX-MARTINEZ was advised of his Miranda rights in Spanish by TFO Duarte.  He verbally acknowledged he understood.  FELIX-MARTINEZ stated he and ZAZUETA were directed where to pick up and where to deliver by a man in Mexico, that they picked up the car in Victorville, and that they believed there were more than twenty (i.e., meaning twenty packages) to be delivered in a blue "maleta" (referring to the black and blue duffel bag).  FELIX-MARTINEZ claimed he was responsible for handing over the bag and ZAZUETA

was responsible for communicating with the others. FELIX-MARTINEZ stated he had been to the Sandhill address twice prior. FELIX-MARTINEZ stated he owned SUBJECT DEVICE 1.

      b.   During the interview with ZAZUETA, TFO Duarte, GS Quezada, and I were present. ZAZUETA was advised of his Miranda rights in Spanish by TFO Duarte. He verbally acknowledged he understood. ZAZUETA stated they picked up the thirty "libras" (which I understood from speaking to the Spanish-speaking law enforcement officers means thirty pounds) off Wilmington Street in an alley from a man in the street and delivered it to the area of Sandhill Avenue, indicating the hand-off to RODRIGUEZ-SANCHEZ. ZAZUETA stated he was going to turn over the remainder to a man in South Gate. ZAZUETA later specified he delivered twenty-eight packages to RODRIGUEZ-SANCHEZ in a blue "maleta." ZAZUETA stated he gets paid fifty dollars per pound that he delivers, and that there were a total of thirty-seven pounds in the vehicle. ZAZUETA confirmed he owned SUBJECT DEVICE 2.

35. During further inspection of the vehicle, TFO Do suspected a hidden compartment could be in the floorboards. TFO Do began using a magnifying device in the area of the front seats. ZAZUETA saw this and indicated to TFO Pena there was a hidden compartment under the floorboards, and showed TFO Do a sequence of buttons and to press in the area of the driver's seat. Following the sequence of buttons, a latch released the front driver's side and passenger's side seats. The seats folded backwards revealing cavities in the floorboard. Inside the cavities were a total of twenty-four zip lock bags,

contained in large vacuum sealed bags, each containing a crystal-like substance resembling methamphetamine. All the suspected methamphetamine was subsequently transported to the DEA HIDTA building for processing.

36. In total, the following drugs were seized from the 1) blue and black bag in the Nissan Sentra and 2) the Nissan Juke:

    a. The twenty-eight packages found in the black and blue duffel bag in the Nissan Sentra weighed an aggregate weight of 13.4 kilograms. Utilizing the TruNarc handheld narcotics analyzer, I tested suspected methamphetamine in the black and blue duffel bag. The TruNarc analyzer displayed a positive result for the presumptive presence of methamphetamine.

    b. The twenty-four packages found inside the cavity in the Nissan Juke weighed 11.9 kilograms. The eleven plastic bags found in the trunk of the Nissan Juke weighed 5.85 kilograms. I did not field-test these narcotics due to the vacuum sealed packaging.

37. All the suspected methamphetamine was transported to the DEA Southwest Laboratory for further processing.

### V. TRAINING AND EXPERIENCE ON DRUG OFFENSES

38. Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

    a. Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and

deliver the drugs and launder the drug proceeds. Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

    b. Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs. The aforementioned records are often maintained where the drug trafficker has ready access to them, such as on their cell phones and other digital devices.

    c. Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices. This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal. In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

    d. Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices. Drug traffickers often keep records of meetings with associates, customers, and suppliers on their

digital devices, including in the form of calendar entries and location data.

### VI. TRAINING AND EXPERIENCE ON DIGITAL DEVICES

39. As used herein, the term "digital device" includes the SUBJECT DEVICES.

40. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

    a. Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

    b. Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are

not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

   c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

   d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

41. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

   a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel

may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above. Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

   b. Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

  42. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

//
//
//
//
//
//
//
//
//
//

## VII. CONCLUSION

43. For all of the reasons described above, there is probable cause to believe that Marco Antonio ZAZUETA and Gustavo Adolfo FELIX-MARTINEZ have committed a violation of 21 U.S.C. § 841(a)(1): Possession with Intent to Distribute a Controlled Substance. There is also probable cause that the items to be seized described in Attachment B will be found in a search of the SUBJECT DEVICES described in Attachment A.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 18th day of
February, 2022.

_[signature]_

THE HONORABLE JEAN P. ROSENBLUTH
UNITED STATES MAGISTRATE JUDGE